702 A.2d 523

ROGER REGAN, PLAINTIFF–APPELLANT, v. CITY OF NEW BRUNSWICK AND NEW BRUNSWICK POLICE DEPARTMENT, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 15, 1997—Decided November 21, 1997.

344

Before Judges LONG, STERN and KLEINER.

*David B. Friedman* argued the cause for appellant (*Balk, Oxfeld, Mandell & Cohen*, attorneys; *Arnold S. Cohen*, of counsel; *Mr. Friedman*, on the brief).

*Susan K. O'Connor* argued the cause for respondents (*Hoagland, Longo, Moran, Dunst & Doukas*, attorneys; *Ms. O'Connor*, of counsel and on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

On May 16, 1994, plaintiff, Roger Regan, filed a complaint alleging that defendants, City of New Brunswick and the New Brunswick Police Department, violated the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (CEPA), in failing to promote him on July 1, 1993, from the position of sergeant to the position of lieutenant. In support of his CEPA claim, plaintiff alleged that three separate investigations which he conducted in 1991 led to the retaliatory employment decision of July 1, 1993.

In his capacity as a sergeant assigned to the detective bureau, plaintiff investigated three particular incidents: a fight between two police officers, Patrolman James Neal and Patrolman Pablo Ortiz, on June 26, 1991; the shooting death of an unarmed civilian, Shaun Potts, by Sergeant Zane Grey on June 30, 1991; and an investigation as to the improper charge of assault on a police officer and assault on a police canine lodged against a civilian, Lester Voorhees, on July 6, 1991.

On defendants' motion for summary judgment, the motion judge superficially mentioned the Ortiz incident and then specifically concluded that the allegations surrounding plaintiff's investigation of the Potts incident did not constitute a *prima facie* claim under CEPA. The motion judge did not consider the allegations of retaliation referable to the Voorhees incident. We conclude that the failure to do so necessitates a reversal of summary judgment and a remand for reconsideration. Based upon the facts alleged, it was incumbent upon the judge to assess plaintiff's complaint based upon the totality of the underlying circumstances which preceded defendant's decision not to promote plaintiff on July 1, 1993. Such an analysis would include a review of each investigation referenced by plaintiff in his complaint.

# I

## Plaintiff's Employment History

Plaintiff has been employed by defendants as a police officer since November 30, 1973. He ultimately was promoted to sergeant. On October 6, 1990, plaintiff and other sergeants employed by defendants took a two-part Civil Service examination for promotion to the rank of lieutenant. This examination was completed in early 1991. The Civil Service promotional list, published March 14, 1991, reflected the following results: Number one, Brian DeFelice, a non-veteran;[1] Number two, Thomas Consalvo, a non-veteran; Number three, Lawrence Evans, a veteran; Number four, plaintiff, a non-veteran; Number five, Zane Grey, a veteran; Number six, Thomas Early, a veteran; Number seven, Joseph Catanes, a non-veteran; Number eight, John Cannon, a non-veteran; and Number nine, Michael Carroll, a non-veteran. Plaintiff contends that once the promotional list was published, he was informed that he and Sergeant Evans would be promoted to lieutenant within the ensuing year.

---

[1] Pursuant to *N.J.A.C.* 4A:4–3.2, the Civil Service promotional list ranks candidates as follows:

1. Eligible candidates entitled to disabled veterans preference in order of their scores;
2. Eligible candidates entitled to veterans preference in order of their scores;
3. Non-veteran eligible candidates in order of their scores.

Pursuant to *N.J.A.C.* 4A:4–4.8, the appointing authority may appoint one of the three interested eligible candidates from an open competitive or promotional list provided:

1. Disabled veterans and then veterans shall be appointed in their order of ranking from an open competitive list;
2. If the eligible who ranks first on a promotional list is a veteran, then a non-veteran may not be appointed.

In the parlance of Civil Service, the selection process is known as the "Rule of Three."

Additionally, if two positions are available, the municipality, pursuant to the "Rule of Three," may select the two candidates to be promoted from the first four candidates on the promotional list.

When this list was published, the Director of the Police Department was William Conway and his administrative aide[2] was Robert McCloskey. In 1992, Conway retired, and McCloskey was appointed Acting Director. McCloskey named Sergeant Michael Carroll as his Deputy Director.

By January 29, 1993, Sergeants Defelice, Consalvo, and Evans had been promoted to lieutenant. As a result of those promotions, plaintiff was number one on the promotional list, followed by Sergeants Grey and Early. On January 29, 1993, Early was promoted to lieutenant.

On July 1, 1993, there were three open lieutenant positions. Based on the "Rule of Three," defendants could select three officers from the first five names on the promotional list. Although plaintiff was in the first position followed by Grey, Cantarese, Cannon, and Carroll, defendants promoted Cantarese, Cannon, and Carroll.

## II

### Plaintiff's CEPA Claim

Plaintiff's complaint alleges that defendants' decisions not to promote him to lieutenant on July 1, 1993, were pretextual and that he was not promoted in retaliation for his conduct during three separate investigations prior to that date.

CEPA, specifically *N.J.S.A.* 34:19–2(e), defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or *other adverse employment action taken against an employee in the terms and conditions of employment." Ibid.* (emphasis added).

CEPA provides, in part:

---

[2] Although the record on appeal refers to Robert McCloskey as Conway's administrative aide, it would appear that the term "administrative aide" was synonymous with the title "Deputy Director."

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to the law;

. . . .

c. Objects to ... any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare. . . .

[*N.J.S.A.* 34:19–3.]

On June 26, 1991, plaintiff was assigned as a sergeant in the detective bureau. On that date, Sergeant Carroll requested that plaintiff investigate an alleged assault on Patrolman James Neal by Patrolman Pablo Ortiz. Ortiz was then a member of Carroll's unit of command. Plaintiff concluded from his investigation that Patrolman Neal was not at fault for the altercation with Ortiz. Although plaintiff's complaint does not specifically contend that the Ortiz investigation was itself a basis for defendants' retaliation on July 1, 1993, plaintiff does contend that substantial animus developed between himself and Carroll arising from plaintiff's investigatory conclusion. This animus persisted until July 1, 1993, and, according to plaintiff, became a factor in the promotional decision on July 1, 1993.

On June 30, 1991, Sergeant Zane Grey, a caucasian, shot and killed an unarmed African–American civilian, Shaun Potts. This incident caused substantial racial unrest in the New Brunswick community. Plaintiff was assigned to investigate this incident on behalf of the City, in conjunction with the Middlesex County Prosecutor's office.

During the Potts investigation, on July 1, 1991, plaintiff learned that there was an unnamed person who may have witnessed the shooting. Director William Conway advised plaintiff that Ser-

geant Carroll knew the witness' identity. Plaintiff, however, had no idea as to what the witness actually saw or knew. Plaintiff contacted Carroll concerning the witness and Carroll advised plaintiff that the witness, apparently a community activist, was gathering information in the community and therefore plaintiff could not question him at that time. Plaintiff states that Carroll "refused to give [the witness] up." Thereafter, plaintiff paged Carroll apparently to renew his request for the name of the potential witness. The page to Carroll was answered by Captain McCloskey. Plaintiff informed McCloskey that the Prosecutor's Office wanted the name of the witness. McCloskey told plaintiff that if the Prosecutor's Office wanted to question the witness, they would have to ask for the witness.

In a memo dated July 5, 1991, plaintiff informed Captain of Detectives, David Bishop, of the failure of Carroll and McCloskey to release the name of the potential witness. This memo was delivered to Bishop on July, 15, 1991, when Bishop returned from a vacation.[3]

On July 6, 1991, the day of Potts' funeral, a large group of African–American residents congregated on a corner near the funeral location. The police, under the direction of Captain McCloskey, dispersed this crowd utilizing the police canine unit. One of the dogs bit a civilian, Lester Voorhees, as he exited a nearby building. Voorhees was not part of the crowd on the street corner. Voorhees was ultimately charged with assaulting a police officer and assault of a police canine.

On July 11, 1991, McCloskey asked plaintiff to conduct an investigation into the Voorhees incident in conjunction with an investigation conducted by the Attorney General's office and the

---

[3] Approximately one month later, plaintiff interviewed the witness whose name had been withheld and determined that the witness' information was not helpful to his investigation.

office of the Middlesex County Prosecutor.[4] During this investigation, plaintiff attempted to secure dispatch tapes between police headquarters and the police vehicle commanded and employed by McCloskey to disperse the crowd. Plaintiff was advised by McCloskey that those dispatches had not been recorded. Thereafter, plaintiff uncovered radio dispatch tapes that revealed laughter during the dispersal of the crowd attributable to both McCloskey and Carroll. Plaintiff reported his discovery to his superiors, Lieutenant White and Captain Bishop, who in turn delivered the transcripts to the Prosecutor.[5]

In support of the contention that his non-promotion on July 1, 1993, was retaliatory, plaintiff references two confrontations with Sergeant Carroll. First, on February 28, 1993, a hearing was scheduled in the North Brunswick Municipal Court regarding the assault charges lodged against Patrolman Ortiz by Patrolman Neal. Plaintiff contends that during the hearing he was speaking to Officer Thomas Selesky, in the presence of other police officers, when Sergeant Carroll shouted, "Tommy, don't talk to that rat fuck." Second, several days following the municipal court proceeding, Sergeant Carroll yelled at plaintiff, "Once a rat, always a rat." Plaintiff contends he confronted Carroll regarding both statements and was informed by Carroll that Carroll was not happy with a witness statement plaintiff had secured regarding the Ortiz matter. Additionally, Carroll accused plaintiff of leading the witness into giving a statement unfavorable to Patrolman

---

[4] In a pre-trial deposition, plaintiff testified that both McCloskey and Carroll were targets of the investigation. Plaintiff's contention is not specifically supported by other evidence in the record on appeal.

[5] The Voorhees incident eventually resulted in a seventy-two page report prepared by the Middlesex County Prosecutor's office. A synopsis of this report was released to the news media. Plaintiff asserted at his deposition that as a result of the Voorhees investigation, McCloskey retired on June 30, 1993, and Deputy Director Carroll was demoted to the rank of sergeant. Plaintiff admitted that his contention was based upon speculation and rumor and was not predicated upon his personal knowledge.

Ortiz. Plaintiff reported these incidents to McCloskey; however, formal action against Carroll was not taken.

Plaintiff contends that although the Ortiz incident does not form the basis for a CEPA violation, animus related to the Ortiz investigation persisted as late as February and March of 1993, and is evidence of retaliation which pervaded the promotional decisions of July 1, 1993. The motion judge did not consider this allegation in granting summary judgment to defendants. In that regard, we conclude the judge erred.

After plaintiff filed his CEPA complaint, he was deposed. Plaintiff testified that he concluded from the Voorhees investigation that Voorhees may have been improperly charged with assault on a police officer and assault on a police canine. Plaintiff opined that the use of dogs by the police for crowd control was "very poor judgment," but did not claim that anything surrounding the Voorhees incident was illegal.

At his deposition, plaintiff also asserted that Carroll's and McCloskey's conduct in failing to release the name of a witness in the Potts investigation was "highly unusual" and violated the basic rules of criminal investigation because plaintiff was in charge of the investigation. Plaintiff also opined that as a "moral" issue, the witness' name should have been revealed because Sergeant Grey's career was at stake.

Additionally, plaintiff stated in his deposition that Carroll thought plaintiff was attempting to have him indicted for his failure to reveal the name of the witness during the Potts investigation. Plaintiff also testified that Carroll, while acting Deputy Director, told other police officers that plaintiff would never be promoted.

As we have noted, after the Prosecutor's investigatory report of the Voorhees incident was released, Carroll was demoted to sergeant and McCloskey retired, effective July 1, 1993. McCloskey's final task as Acting Director was the approval of promotions, effective July 1, 1993. Plaintiff was not promoted to lieutenant on

that date. His complaint alleges that the promotional decision was retaliatory. We note, as did the motion judge, that plaintiff's complaint did not cite any specific statute, rule or regulation which was allegedly violated by either Carroll or McCloskey during or after each investigation conducted by plaintiff. However, at oral argument on defendant's summary judgment motion, in response to the judge's inquiries as to the Potts incident, plaintiff's counsel did request that the judge consider the obstruction of justice statute.

Without considering the Voorhees incident, the judge concluded that plaintiff's claim did not meet the requirement of CEPA that a plaintiff identify a law, regulation or clear mandate of public policy that he reasonably believed was violated at his place of employment.

### III

■ The New Jersey Legislature adopted CEPA in 1986. In enacting CEPA, the Legislature codified the New Jersey Supreme Court's ruling in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980), which protected employees against discharges that violated a clear mandate of public policy.

> In *Pierce*, we recognized that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 84 *N.J.* at 72 [417 *A.*2d 505].... We therefore modified the common law rule permitting employers and employees, in the absence of an employment contract, to terminate the employment relationship with or without cause. *Id.* at 65–66 [417 *A.*2d 505]....
>
> [*MacDougall v. Weichert,* 144 *N.J.* 380, 390, 677 *A.*2d 162 (1996).]

Public policy sources include legislation; administrative rules, regulations or decisions; judicial decisions; and, in some circumstances, a professional code of ethics. *Id.* at 391, 677 *A.*2d 162.

■ "[The purpose of CEPA] is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Township Bd. of Educ.,*

138 *N.J.* 405, 431, 650 *A.*2d 958 (1994). Courts should construe CEPA liberally to achieve its remedial purpose. *Ibid.*

In *Fineman v. New Jersey Dep't of Human Services,* 272 *N.J.Super.* 606, 640 *A.*2d 1161 (App.Div.), *certif. denied,* 138 *N.J.* 267, 649 *A.*2d 1287 (1994), we concluded that in examining a CEPA claim, the court "must first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true." *Id.* at 620, 640 *A.*2d 1161. *See also Falco v. Community Medical Ctr.,* 296 *N.J.Super.* 298, 316, 686 *A.*2d 1212 (App.Div.1997) (*"Fineman and Abbamont* . . . instruct that the court must first determine whether there exists a clear expression of law or public policy, and only then will the factfinder consider whether the plaintiff reasonably believed that a violation of that law or policy has occurred.").

■ Although the motion judge correctly concluded that plaintiff had failed to articulate that he reasonably believed a clear mandate of public policy was violated at his place of employment in reference to the Ortiz or Potts investigation, the judge did not consider plaintiff's allegations concerning the Voorhees investigation. Although not specifically argued to the motion judge, it is clear from our perusal of the record, including plaintiff's complaint, that plaintiff contended that: (1) he reasonably believed that an innocent man, Lester Voorhees, had been improperly charged with crimes; and (2) his report to his superior officers which led to a report to both the Attorney General and the Middlesex County Prosecutor resulted in retaliation by his employer in its decision not to promote him from the position of sergeant to the position of lieutenant.

On appeal, plaintiff specifically argues:

A portion of the prosecutor's report indicated that information received from Plaintiff's report of the investigation, if true, pointed towards the possibility that any one or more of the following criminal charges being brought against McCloskey:

*N.J.S.A.* 2C:21–3b, offering a false instrument for filing, a disorderly persons offense;

*N.J.S.A.* 2C:21–4a, falsifying a record, a fourth degree crime;

*N.J.S.A.* 2C:28–3b(1), making an unsworn falsification to authorities, a disorderly persons offense;

*N.J.S.A.* 2C:28–4a, falsely incriminating another, a fourth degree crime;

*N.J.S.A.* 2C:28–6(2), preparing a false record or document, a fourth degree crime;

*N.J.S.A.* 2C:28–7a(1), making a false entry in a government document or record, a third degree offense;

*N.J.S.A.* 2C:30–2a, official misconduct, a second degree crime.

We are satisfied that had the motion judge engaged plaintiff's counsel in a discourse as to the Voorhees incident the specifics of plaintiff's allegations would have been enunciated. We reach this conclusion noting that the Voorhees incident was specifically included in plaintiff's complaint and in the statement of facts in plaintiff's brief filed in response to defendants' summary judgment motion. We also note that at plaintiff's deposition, defendants' counsel specifically questioned plaintiff whether he believed that Carroll's and McCloskey's conduct during the Voorhees incident was illegal. Although the statutes cited on appeal were not mentioned within plaintiff's testimony, plaintiff did assert his belief that Lester Voorhees may have been improperly charged with assault on a police officer and assault on a police canine.

Thus, plaintiff identified possible criminal statutes violated by McCloskey which proximately led to the retaliatory employment decision. Additionally, plaintiff had previously reported possible improprieties by McCloskey and Carroll relating to the Potts investigation. Although those possible improprieties did not specifically violate a statute or public policy, the report of improper acts in the Potts investigation and the animus between plaintiff and Carroll emanating from the Ortiz investigation are evidence which corroborate plaintiff's contention that reporting McCloskey's alleged violation of the identified criminal statutes led to the retaliatory promotional decision. It was therefore incumbent upon the motion judge to evaluate plaintiff's claim as it pertained to the Voorhees incident and from the totality of plaintiff's employment history.

The facts presented are dissimilar to the facts discussed in *Mehlman v. Mobil Oil Corp.,* 291 *N.J.Super.* 98, 676 *A.*2d 1143 (App.Div.1996), where we concluded that we would "not entertain sources of public policy identified for the first time after trial...." *Id.* at 126, 676 *A.*2d 1143. We specifically indicated that we will not consider on appeal any mandates of public policy neither alleged in a plaintiff's complaint nor relied upon in defense of an employer's motion to dismiss a claim. *Ibid.; see Pierce, supra,* 84 *N.J.* at 75, 417 *A.*2d 505.

■ We also note that plaintiff, when deposed, may not have been aware of the specific statutory provisions implicated by his belief that McCloskey had allowed an innocent man to be charged with assault. As we noted in *Mehlman,* a CEPA plaintiff need not "know, to a legal certitude, the precise contours and components of the public policy." *Mehlman, supra,* 291 *N.J.Super.* at 122, 676 *A.*2d 1143. We reached a similar result in *Abbamont v. Piscataway Township Board of Education,* 269 *N.J.Super.* 11, 634 *A.*2d 538 (App.Div.1993), *aff'd,* 138 *N.J.* 405, 650 *A.*2d 958 (1994), where we concluded that plaintiff's reliance on the "New Jersey Industrial Arts Education Safety Guide" was sufficiently specific to support his CEPA claim, even though plaintiff did not know to a legal certitude at the time he filed his complaint that his employers were violating the policy enunciated in the guide. *Id.* at 24, 634 *A.*2d 538. We therefore reject defendants' argument that we should disregard the Voorhees investigation as raised by plaintiff for the first time on appeal. Moreover, we may consider a plaintiff's contentions on appeal, even though not specifically argued before the trial or motion judge, as long as the issue on appeal is generally the same issue presented before the trial court. *See Docteroff v. Barra Corp.,* 282 *N.J.Super.* 230, 237, 659 *A.*2d 948 (App.Div.1995).

## IV

■ Plaintiff's belief that a person may have been improperly charged with assault would form the basis of his CEPA claim if

that belief was reasonable. *See, e.g., Abbamont, supra,* 269 *N.J.Super.* at 24, 634 *A.*2d 538; *Falco, supra,* 296 *N.J.Super.* at 313–14, 686 *A.*2d 1212. A reasonable and objective belief of a violation is sufficient for a CEPA claim. "The *sine qua non* of a CEPA claim is not the actual occurrence of a violation of promulgated authority or public policy, but rather the existence of a reasonable belief to the effect that such authority or policy has been breached." *Mehlman,* 291 *N.J.Super.* at 123, 676 *A.*2d 1143.

Plaintiff's belief that a violation had occurred at his place of employment seems entirely reasonable under the circumstances. A CEPA plaintiff " 'must show that his belief that illegal conduct was occurring had an objectively *reasonable* basis in fact-in other words that, given the circumstantial evidence, a reasonable lay person would conclude that illegal activity was going on.' " *Young v. Schering Corp.,* 275 *N.J.Super.* 221, 233, 645 *A.*2d 1238 (App. Div.1994) (quoting *Littman v. Firestone Tire & Rubber Co.,* 709 *F.Supp.* 461, 470 (S.D.N.Y.1989)), *aff'd,* 141 *N.J.* 16, 660 *A.*2d 1153 (1995). In evaluating defendants' motion for summary judgment, the motion judge could properly assume that plaintiff, a police officer for over twenty years, knew there were laws against charging innocent persons with crimes. On appeal, plaintiff identifies the specific criminal statutes proscribing false criminal charges. He further cites the report of the Prosecutor's Office indicating that McCloskey may have violated these statutes, assuming the information in plaintiff's report was true. Clearly, it was incumbent upon the motion judge to consider the Voorhees incident, both separately and in conjunction with other incidents in plaintiff's employment history, before summarily dismissing plaintiff's CEPA complaint. The failure to do so clearly violates the standard enunciated in *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Plaintiff was entitled to all inferences that may have been drawn in his favor. *Ibid.; see R.* 4:46–2; *Pierce, supra,* 84 *N.J.* at 61, 417 *A.*2d 505.

The decision granting summary judgment is reversed and defendants' motion is remanded to the trial court for reconsideration

consistent with this opinion.   We do not retain jurisdiction.[6]

---

[6] At oral argument before this court, defendants contended that the promotional process it followed strictly complied with the mandate of *N.J.A.C.* 4A:4–4.8, and thus it was entirely within their discretion whom to promote, provided that they did not promote any eligible candidate lower than the first five names on the promotional list as of July 1, 1993.

Defendants did not raise this argument in their brief on appeal. Although the argument was tangentially referenced at oral argument on defendants' motion for summary judgment, the argument was not briefed by either plaintiff or defendants. We will not consider an issue raised for the first time on appeal unless it relates to "jurisdiction of the trial court or concern[s] matters of great public interest," or otherwise constitutes "plain error." *See Nieder v. Royal Indemnity Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.2d* 142 (1973). Moreover, an issue not briefed is ordinarily deemed waived. *See Matter of Bloomingdale Convalescent Center*, 233 *N.J.Super.* 46, 48 n. 1, 558 *A.2d* 19 (App.Div.1989); Pressler, *Current N.J. Court Rules*, comment on *R.* 2:6–2 (1997).